## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **TOMMY ESTEVAN** | |
| Plaintiff, | |
| v. | Case No. 1:21-cv-02497 (TNM) |
| **MERRICK GARLAND**, *in his official capacity as Attorney General of the United States,* | |
| Defendant. | |

## <u>MEMORANDUM OPINION</u>

The Bureau of Alcohol, Tobacco, Firearms and Explosives repeatedly passed over Tommy Estevan for a Special Agent-in-Charge (SAC) position at various field offices. Estevan now claims that ATF refused to offer him a post because he is Asian, in violation of Title VII of the Civil Rights Act of 1964, as amended (Title VII), 42 U.S.C. § 2000e *et seq.*[1] Before the Court is the Attorney General's motion for summary judgment.

The Court holds that there is no genuine dispute of material fact, and that no reasonable jury could find for Estevan. Attorney General Garland, who oversees the ATF, has provided legitimate, nondiscriminatory reasons for choosing other candidates over Estevan: He was less qualified than each of the individuals ATF chose over him, and ATF hired the most qualified applicant for each post. And because Estevan has not presented evidence that supports an inference of discrimination, the Court will grant the Attorney General summary judgment.

---

[1] Estevan originally alleged that ATF discriminated against him based on his national origin, too. Am. Compl. (Compl.) ¶ 49, ECF No. 27. But he has since dropped that claim. Def.'s Mot. for Summ. J. (MSJ) at 6 n.1, ECF No. 36-1.

**I.**

Tommy Estevan, an Asian American of Vietnamese descent, has a distinguished service record with ATF.  Def.'s Mot. for Summ. J. (MSJ) at 6, ECF No. 36-1.[2]  He started at the Memphis Field Office as a Special Agent in 2003.  Pl.'s Opp'n to Def.'s Mot for Summ. J. (Opp'n) at 6 n.3, ECF No. 39.  Between then and 2017, ATF promoted him to Resident Agent-in-Charge and then to Assistant Special Agent-in-Charge (ASAC) for the Louisville Field Division.  *Id.*  And he served as Acting Special Agent-in-Charge in Louisville in 2019 and 2020.  *Id.* at 6, 8.  Today, he is an ASAC for ATF's Nashville Division.  *Id.* at 6.

While he was Acting SAC in Louisville, however, his career hit a speedbump.  Estevan's daughter—also an ATF employee—called him in December 2019, apparently distraught.  MSJ at 8; Opp'n at 18.  Concerned, Estevan tried to reach two Resident Agents-in-Charge at the Nashville Field Division.  MSJ at 8.  The second agent picked up and, at Estevan's request, dispatched ATF agents to check on Estevan's daughter, who lived in the area.  *See* ATF Internal Affairs Div. Prelim. Investigation Rept. (IAD Report) at 4, ECF No. 36-18.  The special agents did so, apparently without further incident.  *Id.* at 2.  ATF's Internal Affairs Division later opened an inquiry into the matter, to determine whether Estevan appropriately requested the welfare check outside of his chain of authority.  *See* Def.'s Statement of Material Facts (SMF) ¶ 3, ECF No. 36-2; *see generally* IAD Report.  That inquiry was still open when Estevan began to apply to SAC positions in early 2020.  SMF ¶ 3.

SACs are senior leaders in ATF and oversee the operations of an ATF field division.  MSJ at 6.  They are part of the federal Senior Executive Service (SES).  Opp'n at 9.  To get an SES position, a candidate must interview with an Executive Review Board (Review Board), pass

---

[2]  All page citations refer to the page numbers generated by the Court's CM/ECF system.

a panel review, and submit various application materials.  *Id.*  ATF then invites some candidates to final interviews.  *Id.*

The Review Board score is particularly important.  A prospective applicant must earn at least 36 (of 60) points in the ranking and review panel stage and at least 84 (of 140) points in the interview stage to even apply for a SES position.  Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts (Pl.'s SMF) at 2, ECF No. 40.  The minimum qualifying composite score is thus 120.  MSJ at 12.  Estevan earned 49 points for his rating and ranking panel and 85 points for his interview, for a composite score of 134—enough to apply for SES positions.  Pl.'s SMF at 2.

Estavan applied for five SAC positions during spring and summer of 2020.  His first application is not at issue here.[3]  The remaining four positions Estevan applied for fall into two groups:  those filled while the internal-affairs matter was pending, and those filled after the matter was resolved.

The applications in the first group were for SAC positions in Columbus and Nashville.  MSJ at 12.  Estevan was one of two qualified applicants for the Columbus position and the only qualified applicant for the Nashville position.  Opp'n at 13.  The other applicant for Columbus was Roland Herndon, an African American man who had been with ATF four years longer than Estevan and scored 24 points higher than him (158).  MSJ at 12.  Both candidates interviewed with the same panel:  ATF's Acting Director Regina Lombardo, Associate Deputy Director Marvin Richardson, and Assistant Director of Field Operations Tom Chittum.  Pl.'s SMF at 2–3.

Lombardo, the final decisionmaker, was unhappy with the small candidate pool for the positions.  MSJ at 12–13; *see* Richardson-Lombardo Emails (May 21, 2020) at 2, ECF No. 41-13

---

[3]  Estevan concedes that any claims he may have regarding his first application are outside the statute of limitations.  Am. Compl. ¶ 47 n.1, ECF No. 27.

(responding to Richardson's statement that "we only had two [qualified] applicants who" applied for the SAC positions with "Ugggg.  Lets [sic] talk tomorrow.  Does anyone want to lateral?").  She ultimately selected Herndon over Estevan for the Columbus position and non-selected the Nashville position.  Opp'n at 14.  That is, Lombardo decided not to immediately fill the Nashville position.  *Id.*

Chittum called to give Estevan the bad news.  *See* Lombardo Dep. at 19, ECF No. 41-5.  Estevan was "taken back" by being rejected and asked to set up another call so he could receive feedback on how to improve.  Estevan Dep. at 18, ECF No. 41-7.

During that call, Estevan says Chittum described him as "too technical" and encouraged him to develop his skills as a strategic thinker by observing Shawn Morrow, the new SAC in Louisville.  *Id.* at 18–19.  And Estevan claims Chittum said that "when we walk, we look at your feet," though this comment's context is unclear.  *Id.* at 18.  Estevan took both comments as Asian stereotypes.  *Id.* ("[I]t's the – a common thing for Asian folks like myself, to be referenced as too technical, along with the looking at your feet when you walk.  So I – I really was taken back by those comments.").  Chittum also told Estevan to consider opportunities with Internal Affairs, not knowing that Estevan was already part of the Professional Review Board.  *Id.*

While it does not appear that ATF told Estevan at the time, Lombardo later explained that her practice was not to consider anyone for an SES position who had a pending internal affairs matter.  Lombardo Dep. at 10–11; Lombardo Aff. ¶ 105, ECF No. 36-13 ("It is my decision to not consider anyone for an SES position and leader of the organization if there is a pending internal affairs matter until it is resolved.  I will not consider anyone for a position of leadership and a role model for others to emulate with allegation of poor judgement or integrity.  However, I will consider them once the issue is resolved and no action is necessary.").

That summer, ATF reposted the Nashville SAC position and posted a position in Tampa. Estevan applied for both. Opp'n at 16–17.[4] This is the second group of applications. The internal affairs matter was still open when Estevan applied, but it was resolved by the time ATF filled the positions. Pl.'s SMF at 1–2.

After completing its investigation, the Internal Affairs Division decided a management referral action was appropriate. Estevan Dep. at 16. This is a minor disciplinary step. *See id.*; ATF O 8610.1D (ATF Internal Affairs Policy) at 8, ECF No. 36-16. So one of Estevan's supervisors spoke to Estevan and told him that in the future, issues like the one with his daughter should be referred to local law enforcement. Lauder Dep. at 16, ECF No. 41-3. With that, the internal affairs matter ended on August 11, 2020. Pl.'s SMF at 1–2. So ATF could have considered Estevan for either the Nashville or Tampa SAC position under Lombardo's policy. *See* Lombardo Aff. ¶ 105.

But unlike the first two positions, ATF did not interview Estevan for either of these. Instead, ATF informed Estevan that though he had "been rated among the best qualified applicants," ATF was only offering interviews to the three applicants with the highest Review Board scores. Pl.'s SMF at 4. ATF ultimately picked Mickey French for the Nashville position and Craig Saier for the Tampa position, both white men. *Id.* at 4–5. Both had scored significantly higher in their applications: Saier had a Review Board score of 160 (26 points higher than Estevan), while French scored 148 (14 points higher that Estevan). *Id.* at 5.

After five rejections (counting his first application), Estevan called foul. He filed an employment discrimination complaint with the Department of Justice (ATF's parent agency), alleging that ATF had discriminated against him because he is Asian and Vietnamese. Final

---

[4]  ATF also reposted the Philadelphia position, but Estevan did not apply. MSJ at 13–14.

Agency Decision at 7, ECF No. 36-26.  DOJ reviewed the matter and concluded that the evidence was "insufficient to establish discrimination."  *Id.* at 20.

So Estevan sued.  He took the matter to the U.S. District Court for the Middle District of Tennessee, which transferred it here.  ECF No. 16.  The Attorney General now moves for summary judgment.

## II.

To win summary judgment, the movant needs to show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he mere existence of *some* alleged factual dispute" will not defeat summary judgment unless the factual dispute "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  The movant bears the initial burden of showing that there is no genuine dispute.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the movant meets that burden, the nonmovant must provide evidence of "specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)).  But "if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249–50.

Title VII protects federal employees from race-based discrimination.  *See* 42 U.S.C. § 2000e-16.  The parties agree that the *McDonnell Douglas* burden-shifting framework governs Estevan's discrimination claim.  MSJ at 17; Opp'n at 21; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

That framework gives the employee the burden to make a prima facie showing of racial discrimination.  *McDonnell Douglas Corp.*, 411 U.S. at 802.  To make that showing, the employee must allege that (1) he belongs to a protected class under Title VII, (2) he "suffered a

cognizable adverse employment action," and (3) the action creates an "inference of discrimination." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015). The burden then shifts to the employer to show "a legitimate, non-discriminatory reason for the challenged decision." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008) (Kavanaugh, J.). If the employer does so, the burden shifts back to the employee to show that reasons the employer gave were a mere pretext for discrimination. *See Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1114 (D.C. Cir. 2016).

But if the employer offers a legitimate reason for the employment decision, "the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Brady*, 520 F.3d at 494. Because employers almost always allege a facially neutral reason for their decision, the prima facie case is usually "irrelevant." *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009). That leaves the Court to resolve the "central question": Is the employee's evidence enough for a reasonable jury to conclude that the employer's reason was pretextual and that the true reason was discrimination based on membership in a protected class? *Brady*, 520 F.3d at 494.

### III.

The Court considers whether a reasonable jury could find that the Attorney General discriminated against Estevan. Because Estevan has not offered evidence that shows the Attorney General's legitimate and nondiscriminatory reasons for not selecting Estevan were pretextual and that the true reason was race-based discrimination, the Court concludes that no reasonable jury could find for him.

The Attorney General gives different reasons for the two application groups. Both are legitimate and nondiscriminatory.

For the first two vacancies at issue (Columbus and Nashville), the Attorney General says that he did not select Estevan for either position because Estevan had a pending internal affairs matter.  MSJ at 21–22.  The Attorney General also offers the independent reason that Herndon, who ATF selected for Columbus, was better qualified than Estevan.  MSJ at 22.  Herndon scored 24 points higher with the Review Board than Estevan, had been with ATF four years longer than Estevan, and had been in federal service over a decade longer.  *Id.* at 23–24.  And Herndon was already an ASAC in Columbus and would thus provide greater continuity for that office.  *Id.* at 24.

For the second two vacancies (Nashville and Tampa), the Attorney General explains that Estevan was not the most qualified candidate.   Mickey French, who ATF selected for the Nashville post, scored 26 points higher with the Review Board than Estevan and had several assignments as an Acting SAC (Estevan had only one).  *Id.* at 25.  And Craig Saier, who ATF selected for Tampa, scored 14 points higher than Estevan and had been with ATF three years longer.  *Id.* at 26.

In sum, the Attorney General says that Estevan was essentially unqualified for the first two posts because his internal affairs matter ruled him out, and that he was less qualified than the applicants selected for any of the posts.  The Attorney General's "qualifications-based justification" is a "legitimate, nondiscriminatory reason" for refusing to hire or promote someone.  *See Holcomb v. Powell*, 433 F.3d 889, 896 (D.C. Cir. 2006).  So the Attorney General has met his initial burden, and the Court need not determine whether Estevan made out a prima facie case.  *Brady*, 520 F.3d at 494.

Despite the substantial evidence supporting the Attorney General's justifications, Estevan contends that these reasons were just pretext for racial discrimination.  Estevan has a steep hill to

climb: "The more valid a reason appears upon evaluation, the less likely a court will be to find

that reason pretextual." *Ryan v. Reno*, 168 F.3d 520, 524 (D.C. Cir. 1999); *see also Tex. Dep't of*

*Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981) (noting plaintiff may demonstrate pretext

"indirectly by showing that the employer's proffered explanation is unworthy of credence").

And, recall that the Attorney General has established that Estevan was less qualified than each of

the individuals who ATF chose over him, and that ATF hired the most qualified applicant for

each post. *See Fischbach v. D.C. Dep't of Corrs.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)

(explaining courts must "respect the employer's unfettered discretion to choose among qualified

candidates").

With this in mind, the Court now considers Estevan's allegations of pretext. He contends

that inconsistencies and irregularities in the hiring process and discriminatory comments made

by his interviewers create an inference of discrimination. He gives seven examples: (1) the

internal affairs matter was not a legitimate basis for refusing to select Estevan under ATF policy,

and, in any event, it was not ATF's initial justification; (2) Lombardo and Chittum made

stereotypical and discriminatory comments to Estevan; (3) ATF non-selected Estevan when he

was the only applicant, but in one instance gave a SAC position to another sole applicant; (4)

ATF did not have a policy of only offering interviews to the top three candidates, but refused to

interview Estevan on that basis; (5) ATF varied its interview procedures; (6) ATF did not take

Estevan's professional accomplishments seriously; and (7) ATF has hired few Asians for SES

positions. Opp'n at 24–30. The Court takes each of these examples in turn.[5]

---

[5] The Attorney General argues that Estevan's non-selection could not possibly have been
discriminatory because none of the panelists knew Estevan's race until *after* they made their
employment decisions. MSJ at 19. All three panelists asserted as much. Chittum Aff. ¶ 7, ECF
No. 36-11; Richardson Aff. ¶ 7, ECF No. 36-12; Lombardo Aff. ¶ 7. Louisville SAC Morrow,

*1. Internal Affairs Matter*.  Estevan agrees that if he was the subject of an Internal Affairs investigation, he would not be eligible for a SES position.  *See* Estevan Dep. at 19.  But Estevan claims that there is no ATF policy that a *witness* in an internal affairs matter is ineligible for a SAC position.  Opp'n at 27–28.  He stresses that ATF never told him he was the *subject* of an internal affairs investigation, nor did it tell him that such a matter would impact his eligibility. *Id.* at 29.  And he claims that several ATF executives testified that his decision to send special agents to check on his daughter was "not prohibited."  *Id.*  Finally, he notes that Internal Affairs completed the investigation and issued its management referral in March 2020, several months before he interviewed for the first two positions.  *Id.*  The Attorney General responds that the subject-witness distinction is irrelevant and that the matter did not end until after the management referral was complete in August 2020, so ATF's decision was legitimate.  Reply at 22–23, ECF No. 43.

The evidence supports the Attorney General.  ATF's internal investigations policy explains the difference between "subjects" and "witnesses."  An employee *witness* is "a Bureau employee who is purported to have observed or have information regarding" behavior contrary to ATF policy or "that might reflective negatively on the Bureau or bring the Bureau into disrepute."  ATF Internal Affairs Policy at 8.  In contrast, a *subject* is a "Bureau employee who is alleged to have" violated policy or acted in a way that might "bring the Bureau into disrepute." *Id.*  If Internal Affairs interviews someone as a witness and that person becomes a subject,

---

Estevan's supervisor when he was applying, agreed.  Morrow Dep. at 12, ECF No. 41-8.  But Estevan's previous supervisor, Stuart Lowery, testified that someone would "potentially" know from Estevan's appearance that he was of Asian descent (though Lowery himself did not realize that when he first met Estevan).  Lowery Dep. at 5, 20, ECF No. 41-6.  And it is undisputed that both Lombardo and Richardson had met Estevan before the telephonic interview.  Lombardo Dep. at 14; Richardson Dep. at 17, ECF No. 41-1.  So the Court is not persuaded that no reasonable jury could conclude that at least Lombardo and Richardson knew Estevan's race.

Internal Affairs is supposed to inform him. *Id.* at 21. The parties do not seem to dispute that this did not happen here. Opp'n at 29; *see* MSJ at 29 n.4; Reply at 22–23.

But Internal Affairs undisputedly gave Estevan a management referral "for action" because of his use of ATF's personnel to check on his daughter. *See* Estevan Dep. at 16. Management referrals are appropriate for "matters that are deemed minor infractions of Bureau policy or are performance-related in nature." ATF Internal Affairs Policy at 19. Because a management referral would only be appropriate for someone whose conduct is the focus of an Internal Affairs investigation, Estevan must have been a subject of that investigation.

More importantly, there is no evidence the witness-subject distinction matters here. Lombardo consistently testified that her policy was not to select anyone *involved* in an internal affairs matter, even if he were not yet a subject. Lombardo Dep. at 12; Lombardo Aff. ¶ 105.[6] And while Estevan is right that Lombardo testified that she was uncertain whether she non-selected Estevan because of the internal affairs matter, Lombardo Dep. at 19, that does not show a "shifting justification" for his non-selection, Opp'n at 28. Lombardo was also uncertain how many times the Nashville position was even posted. Lombardo Dep. at 19. That ATF's Acting Director was unsure about the reasons why she non-selected a particular job applicant two years

---

[6] Lombardo testified that:

> A: . . . [I]f you are involved in an internal investigation [then] you are not to be considered. . . .
> Q: Is that someone who is the subject of an investigation or receives a certain reprimand?
> A: If they are involved in an internal affairs investigation, whether they are a subject, a target, potentially a witness that turns into a subject, but if they have a pending internal affairs matter.

Lombardo Dep. at 12.

ago "is not significantly probative," *Anderson*, 477 U.S. at 249–50, particularly because the non-selection tracked her stated policy.

Nor does Chittum's post-interview advice show a shifting justification.  Estevan stresses that Chittum talked about Estevan's interview performance, not the internal affairs matter, when he called him after the interview.  Opp'n at 28.  But Chittum testified that what he told Estevan on that call was "commentary on my assessment of his performance during the interview," not the reasons Lombardo did not select Estevan.  Chittum Dep. at 19.

Estevan is also mistaken when he suggests that the internal affairs matter resolved when Internal Affairs finished its investigation in March 2020 and issued the management referral.  Estevan's management referral was "for action."  Estevan Dep. at 16.  A management referral for action "gives the manager 60 days to investigate the information contained in the referral."  ATF Internal Affairs Policy at 19.  The manager is then supposed to discuss the matter with the Office of Chief Counsel, determine a response, and report that plan to Internal Affairs.  *Id.*  Here, that action was just a conversation with Estevan.  Lauder-Winston Emails at 2, ECF No. 36-21.  But Lombardo made clear that an applicant did not become eligible again until after any management referral was complete.  Lombardo Dep. at 10.  That was not until August 2020.  Lauder-Winston Emails at 2.  So Estevan's internal affairs matter disqualified him for the first two positions.  And Estevan has provided no evidence that ATF elsewhere applied this policy differently.

Finally, Estevan protests that his use of ATF employees to perform a wellness check on his daughter was not prohibited and that his choice to do so was insignificant.  Opp'n at 29.  The Attorney General says he is wrong, but the internal affairs matter's merits are not relevant here.  Lombardo's policy of not selecting applicants with pending internal affairs matters turned on that *status*, not the charge's seriousness.  Lombardo Dep. at 12.  And Estevan has provided no

evidence that, for example, a non-Asian applicant with a similarly minor pending internal affairs matter was offered a SAC position.

In sum, Estevan has provided no evidence that would show ATF's refusal to select him for the first two positions based on his pending internal affairs was pretextual.[7]

*2. Stereotypical and Discriminatory Comments*.  Estevan next argues that certain "stereotypical, subjective, and discriminatory comments" made by Lombardo and Chittum create an inference of discrimination.  Opp'n at 27.  Specifically, Estevan points to Lombardo's testimony that he was "in the weeds" and not "strategic enough."[8]  And he claims that Chittum said that he "was too technical" and that "when we walk, we look at your feet."  Estevan Dep. at 18; *see also* Chittum Dep. at 18 ("In response to one of the questions I asked [Estevan] about

---

[7]  Relatedly, Estevan objects to Chittum's post-interview advice that he seek experience on the Professional Review Board, not realizing that Estevan already served there.  Opp'n at 28.  He says that "it simply makes no logical sense that his [Internal Affairs] participation was a reason for his non-selection, while at the same time suggesting he look at an [Internal Affairs] position." *Id.* at 28–29.  This argument lacks merit.  No one supposes that serving on the Professional Review Board resembles being investigated by Internal Affairs and receiving a management referral for action based on a finding of misconduct.

[8]  Estevan also accuses Lombardo of saying he was "too technical," but nowhere in the record does she say this.  Opp'n at 27.  She did respond when Estevan's counsel asked her if she discussed with Richardson and Chittum whether Estevan was "too technical":

> Q. Was there discussion amongst yourself, Mr. Chittum, and Mr. Richardson that Mr. Estevan was too technical?
> A. That could have been a part of it because he has to submit technical qualifications, so maybe he heard the technical piece, and technical means in the weeds.  Maybe he is not—it is not strategic enough.  Technical is a word that many use to describe when you have the technical qualifications.  You know, OPM puts out, here is your technical qualifications.  That is a word that OPM uses and here are the, you know, confidence in character qualifications.  One may have technical skills but they don't have the other skills so it is possible.

Lombardo Dep. at 20.

strategic challenges and how we will confront them, he gave a very technical answer[.]"). Estevan understood these comments as Asian stereotypes.  Estevan Dep. at 18; Opp'n at 27–28.

The Attorney General responds that Lombardo's comments were not discriminatory. Reply at 17–22.  And for Chittum's comments, the Attorney General says, first, that Estevan should be unable to rely on the "feet" comment because Estevan did not raise it in response to his interrogatories.  Reply at 19–20.  Second, the Attorney General points out that Chittum was not the decisionmaker and that his comments, even if they were discriminatory, cannot be attributed to Lombardo.  *Id.* at 20–22.

The Attorney General is right.  Though Lombardo did say that Estevan was "in the weeds" and was not "strategic enough," Estevan does not plausibly argue that those statements were stereotypes of Asian people.  Opp'n at 27.  The articles Estevan cites in support of his argument talks about Asians being stereotyped as "robotic," "stoic," "unfeeling," or "good at science."  *Id.*  So Estevan's arguments essential boils down to "'in the weeds' is the same as 'robotic,' and saying an Asian person is robotic is a stereotype."  That is a stretch.  And it is even less plausible when Lombardo's comments are considered in context.  Here is one example of Lombardo using the phrase "in the weeds" to describe Estevan's performance:

> [S]ometimes I hear what I call too much in the weeds or talking about how I did this or how I did that or I met with this person, I met with that person as opposed to where you would—if you were sitting in that seat as a SAC, where would you lead the organization? How would you lead the field division to accomplish the ATF's missions and goals for the year?  So typically I like to hear that it is not always in the weeds, I call it, or always too day-to-day work, that they haven't shifted from a job of an ASAC which is operational.

Lombardo Dep. at 18.  Lombardo's comments show a concern about whether Estevan was too focused on day-to-day operations to achieve long-term organizational goals, not that Estevan was "robotic," "stoic," "good at science," or anything else Estevan alleges are stereotypes.

The same is true for Chittum.  While Chittum noted that Estevan gave a technical answer, Chittum's concern was that the answer was "not a strategic answer about the long-term vision for the organization."  Chittum Dep. at 18.  Here too, Chittum's statement does not come close to characterizing Estevan as robotic, stoic, unfeeling, or anything else Estevan has characterized as a stereotype.  As for the "when we walk, we look at your feet" comment, Chittum was not asked about it, and it came up for the first time in Estevan's deposition.  *See* Estevan Dep. at 18; s*ee generally* Chittum Dep.  Estevan provided little context, other than Chittum allegedly said "you've got to look forward."  Estevan Dep. at 18.

The Attorney General asks the Court not to consider the "feet" comment because Estevan did not identify these statements in his response to his first interrogatory, which asked Estevan to identify the factual basis for his complaint, nor did Estevan supplement his response.  Reply at 19; *see generally* Pl.'s Resp. to Def.'s First Interrog., ECF No. 43-3.  The Attorney General points to Estevan's duty to supplement or correct his interrogatory responses under Rule 26(e)(1).  Failure to abide by Rule 26(e) means that the information the party failed to provide cannot be used "unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  But a party only needs to supplement a response "if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  Fed. R. Civ. P. 26(e)(1)(a); *see Kapche v. Holder*, 677 F.3d 454, 468 (D.C. Cir. 2012).  The Attorney General learned of those statements during Estevan's deposition, and the Attorney General does not argue that it was prejudiced by Estevan's initial omission.  Because the statement was "made known" to the Attorney General during discovery, Estevan can use it here.  *Kapche*, 677 F.3d at 468.

And even considering that statement, Estevan's testimony that Chittum said "when we walk, we look at your feet," without context, does not support an inference of discrimination. First, Estevan has offered no evidence beyond his own testimony that looking at your feet while you walk is a stereotype or slur toward Asian people.  And even if he had, one comment by a non-decisionmaker is not enough to show the proffered rationale was pretextual.  *Cf. Freedman v. MCI Telecomms. Corp.*, 255 F.3d 840, 848 (D.C. Cir. 2001) ("[A] singular stray comment does not a hostile environment make.").[9]

Second, Estevan testified that Lombardo was the ultimate decisionmaker, not Chitttum. *See* Estevan Dep. at 5.  To be sure, a non-decisionmaker's comments may support an inference of discrimination in limited circumstances.  *See*, *e.g.*, *Walker*, 798 F.3d at 1095–96.  But Estevan does not argue that Chittum's post-decision comments were the "proximate cause of the ultimate employment action" taken by Lombardo.  *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011).

In sum, Estevan has not provided any persuasive evidence that any comments made by the panel were discriminatory.

*3. Sole Applicant*.  Estevan also points to his non-selection when he was the only qualified applicant for two SAC positions.  Opp'n at 24–25.  For both his initial application to Nashville and his application to Philadelphia, Lombardo non-selected and reposted the position.  Reply at 9–10.  But for a SAC posting in San Francisco, Lombardo selected the only applicant,

---

[9]  Estevan also implies that increased prejudice against Asians because of COVID-19 supports his discrimination claim.  Opp'n at 6.  "But the existence of heightened levels of discrimination against Asians in general [due to the COVID-19 pandemic] says nothing about the conduct of the Defendant[] in question in this suit."  *Chen v. Yellen*, 20-cv-50458, 2022 WL 2818709, at *7 (N.D. Ill. July 19, 2022).  The Court cannot assume that just because some people harbor discriminatory views, that the federal employees here must have discriminated against Estevan because of his race.

Patrick Gorman, a white man, without an interview. Opp'n at 25. And Estevan asserts that Lombardo said she would not place him in a SAC position if he were the only candidate. *Id.*

But Lombardo's policy was that she would non-select a position either when she wanted a larger pool of candidates to pick from or because she was not confident the single candidate who applied was a good fit. Lombardo Dep. at 12 (the purpose of non-selecting is "to see people put in that I can make a sound selection, not one name, that I can talk, interview, and decide does that person have the right skill set for a certain field division"); *id.* ("non-selecting means I just don't have the right leadership style or qualifications for a specific field division"); Chittum Dep. at 15 (Estevan was non-selected for Philadelphia "because [Lombardo] thought it would be better to fill it with a competitive pool of applicants than simply select the one person who applied").

Lombardo did not testify that she would not select Estevan were he the only candidate, or that she would never select when there was only a single candidate. And the candidates who Lombardo ultimately selected in both Philadelphia and Nashville had much higher Review Board scores that Estevan—187 and 160 respectively. McBeth-Lombardo Emails at 2, ECF No. 36-22. "A reasonable jury ordinarily cannot find discrimination simply from the fact that an employer takes extra steps to find better-qualified employees." *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1229 (D.C. Cir. 2008) (Kavanaugh, J.). More, Estevan presents no evidence that Gorman's selection was improper. Indeed, neither party provided much detail about Gorman, other than that he was the only qualified applicant to apply for the San Francisco post, was white, and was selected. Gorman's selection, bereft of context, does not advance Estevan's claim.

*4. Top Three Candidates*.  More, Estevan objects that ATF had no policy limiting interviews to candidates with the three highest Review Board scores.  Opp'n at 30.  Rather, he says, Lombardo was free to interview him for the Nashville position when it was reposted.  *Id.*

As the Attorney General points out, Estevan is wrong that ATF had no such policy.  *See* ATF SES Staffing Plan at 3, ECF No. 36-15; McBeth-Lombardo Emails at 2 ("[Y]ou may only interview the TOP 3 SCORING APPLICANTS per announcement").  Of course, there are exceptions.  Lombardo said if the third and fourth highest scores were close, they would interview both applicants.  Lombardo Dep. at 20.  For the second Nashville posting, Estevan had the fourth highest Review Board score.  McBeth-Lombardo Emails at 2.  But his score was 20 points lower than the third highest scorer.  *Id.*  And Estevan came in fifth in Tampa, 14 points below the third highest scorer.  *Id.*  So both under ATF's policy and Lombardo's normal practice, there was no reason to expect Estevan would get an interview for either Nashville or Tampa.

*5. Interview Procedures.*  Estevan also raises various concerns about his interview for the Nashville and Columbus positions.  First, he complains that the panel did not review his performance evaluations, instead relying on his performance in the interview itself and his other application materials.  Opp'n at 25.  But he does not explain how this supports his discrimination claim.  Estevan points out that he received an "Outstanding" from his past two supervisors, Morrow and Lowrey, and that they both saw this as an earned grade.  *Id.* at 26; Lowrey Dep. at 7; Morrow Dep. at 5.  And he complains that Chittum did not seem to accord the evaluations much weight.  Opp'n at 26; Chittum Dep. at 16.  Yet he does not provide evidence that the panel considered any other applicant's evaluations differently or otherwise discriminated against him by not considering them.  So these claims do not show pretext.

Next, he claims that "Lombardo convinced herself that because she is a gay female, she would not be likely to discriminate against another protected class," presumably suggesting she thus could not recognize her own bias. Opp'n at 25. But Lombardo's testimony supports the exact opposite conclusion. Lombardo Dep. at 6 ("Just because I am a gay female doesn't mean that I won't discriminate against someone else."); *id.* at 27 ("And the fact that I am a gay female doesn't say that I can't possibly discriminate against anybody. But when you are in a protected class, you are more mindful of those who may feel that they are discriminated against, so I am very careful to always be open to every walk of life.").[10] He also suggests that Chittum broke from his normal habits by considering materials outside Estevan's application, but Chittum explained that he sometimes contacts interviewees' supervisors. Opp'n at 25; Chittum Dep. at 16.

The interview procedures thus do not support his discrimination claim.

*6. Relative Qualifications.* Next, Estevan notes that his tenure as acting SAC at the Louisville Field Office bolstered his credentials and that Herndon, who Lombardo ultimately picked to run Columbus, had no experience as an acting SAC. Opp'n at 25–26. The Attorney General counters that Estevan was less qualified than all the candidates who Lombardo chose over him, including Herndon. In particular, Herndon's Review Board score was 24 points higher

---

[10]  Estevan also maintains that Lombardo contradicted herself by saying that a SAC should be able to work in any office and that who she selected for a particular field office depended on that field office's needs. Opp'n at 30. Viewed in the light most favorable to Estevan, there is no contradiction—or even tension—between those statements in context. Lombardo's statement that "I should be able to put an SES in any SES position in the whole entire federal government" goes to what *makes someone a good manager.* Lombardo Dep. at 23. Her testimony that "I have to figure out who would align best and what the need is for each of those field offices" goes to *who will be the best manager for a particular field office. Id.* at 8. And the Court is not persuaded by Estevan's insinuation that Lombardo's consideration of her prior experience with candidates when considering them was somehow improper. *See* Opp'n at 30.

than Estevan's, and Herndon worked for ATF 14 years longer; French's Review Board score was 26 points higher, and he had more assignments as an acting SAC; and Saier's score was 14 points higher, and he had worked for the agency three years longer.  *See* MSJ at 18–22.

To show that another candidate's selection based on their qualifications is evidence of discrimination, an employee must show that he was "*significantly* better qualified for the job" than the applicant selected.  *Adeyemi*, 525 F.3d at 1227.  Courts must "respect the employer's unfettered discretion to choose among qualified candidates." *Fischbach*, 86 F.3d at 1183.  After all, federal courts do not sit as "super-personnel department[s] that reexamine[] an entity's business decisions." *Holcomb*, 433 F.3d at 897.  Title VII is not a vehicle to re-hash close personnel calls between two comparable candidates.  *See Battle v. Mnuchin,* 480 F. Supp. 3d 198, 204 (D.D.C. 2020).

Here, as the Review Board scores indicate, Estevan's evidence does not suggest that he was "significantly better qualified" than any of the selectees.  *Holcomb,* 433 F.3d at 897.  On the contrary, the record shows that each of the candidates selected over Estevan was better qualified. It is undisputed that Saier and French both had higher Review Board scores than Estevan, and that each had been at the agency longer.  Pl.'s SMF at 5; MSJ 25–27.  And while Herndon did not have experience as an acting SAC, his Review Board score was also higher than Estevan's. *Id.* at 2.  So Estevan has generally failed to provide evidence that he was *significantly* better qualified than Herndon—or any of the other candidates Lombardo selected over him.

*7. Asian Representation at ATF.*  Finally, Estevan takes a swing at a statistical argument. He points out that between 2017 and 2021, ATF promoted only one Asian person to an SES position.  Opp'n at 26.  But "statistical calculations performed in discrimination cases are not probative of anything without support from an underlying statistical theory." *Battle*, 480 F.

Supp. 3d at 208.  And what Estevan offers is not even a statistical calculation.  It cannot support his discrimination claim.

## IV.

Taken together, Estevan's evidence is insufficient for a reasonable jury to find that ATF's given reasons for not selecting him are pretextual.  Thus, the Court will grant the Attorney General's motion for summary judgment.  A separate Order will issue today.

_____

Dated: January 30, 2023                    TREVOR N. McFADDEN, U.S.D.J.